POTTER HANDY LLP
Mark Potter, Esq., CA SBN 166317
Russell Handy, Esq., CA SBN 195058
Naomi Butler, Esq. CA SBN 332664
Cara Townsend, Esq., CA SBN 220356
100 Pine Street, Ste 1250
San Francisco, CA 94111
Phone: (415) 534-7970;
Email: ServeHT@potterhandy.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Jane Doe (UB-00004),**<br><br>Plaintiff,<br><br>v.<br><br>**Uber Technologies, Inc.**<br>**Raiser-CA, LLC;** and<br>**DOE 1**, an unknown Uber driver who transported and commercially sexually exploited Plaintiff while she was a minor;<br><br>Defendants | Case No.<br><br>**Complaint for Damages:**<br>**18 U.S.C. § 1595**<br>**18 U.S.C. § 2255**<br><br>**Demand for Jury Trial** |

## PLAINTIFF'S COMPLAINT

## INTRODUCTION

1. Plaintiff, Jane Doe (UB-00004), files this civil lawsuit to seek compensation for the harms and losses she sustained as a result of being a victim of sex trafficking that occurred when she was 16 and 17 years old as well as being the victim of sexual assault.
2. During the relevant period, Plaintiff was repeatedly transported by rideshare services operated by Defendant to locations where she was subjected to illegal sex trafficking orchestrated by Plaintiff's trafficker.
3. Additionally, one of Defendants' drivers paid for sex with the Plaintiff, thus committing commercial sexual exploitation and statutory sexual assault of a minor.
4. Defendants' platform did not merely provide neutral transportation. It operated under policies and incentive structures that encouraged drivers to complete rides even where clear policy violations and indicators of risk were present.
5. As alleged herein, Defendant's own rules prohibited transporting unaccompanied minors. Yet Defendant designed and enforced its system in a manner that discouraged drivers from declining or cancelling such rides.
6. Defendant's platform provided a critical logistical component of this sex trafficking enterprise by enabling the repeated and efficient transportation of Plaintiff and furthered an unlawful enterprise.
7. Despite numerous observable indicators of harm and exploitation, Defendant failed to implement reasonable safeguards or take action to prevent continued injury.

## PARTIES

8. Plaintiff is a resident of Kern County, California.[1]

9. Defendant Uber Technologies, Inc. ("Uber") is a Delaware corporation with its principal place of business in San Francisco, California. During the relevant period, Uber developed, owned, controlled, operated, maintained, and profited from the Uber technology platform through which riders requested transportation and drivers were matched with, dispatched to, and paid for completing rides.

10. Defendant Rasier-CA, LLC ("Rasier-CA") is a Delaware limited liability company affiliated with and controlled by Uber. During the relevant period, Rasier-CA conducted Uber's rideshare transportation business in California and operated under the Uber name and brand. Rasier-CA held or exercised the California regulatory authority under which Uber-affiliated rideshare transportation was offered in California and was responsible, in whole or in part, for compliance with California requirements governing transportation-network companies, drivers, rider safety, and the transportation of unaccompanied minors.

11. On information and belief, Rasier-CA contracted with, onboarded, authorized, or maintained contractual relationships with drivers who provided Uber-branded rides in California, including one or more of the drivers who transported Plaintiff. Rasier-CA was responsible, in whole or in part, for the California driver network, driver eligibility, driver access to the Uber platform, safety requirements, driver policies, regulatory compliance, and the transportation services provided to Plaintiff.

12. Defendant Uber is a common carrier within the meaning of California Civil Code § 2168, as it transports passengers for hire and holds itself out to the public as providing transportation services. As a common carrier, Defendant owed Plaintiff

---

[1] Contemporaneously with the filing of this Complaint, Plaintiff is filing a Motion to Proceed Anonymously based on the inherently intimate and personal nature of the allegations. Plaintiff will provide her identity to counsel for the defendants upon entry of a protective order.

the highest duty of care under California Civil Code § 2100, including a duty to exercise utmost care and diligence for her safety. This heightened duty required Defendant to take reasonable measures to identify, prevent, and respond to foreseeable risks of harm, including the use of its platform to facilitate the exploitation of vulnerable or underage individuals.

13. The true names and capacities of Defendants DOES 1–10 are persons or entities whose true names, identities, and forms are currently unknown to Plaintiff. Plaintiff is informed and believes, and thereupon alleges, that each of the fictitiously named Defendants DOES 1–10 is responsible for the conduct alleged in this Complaint and that, through their conduct, these fictitiously named Defendants actually and substantially caused Plaintiff's injuries and damages.

14. The term "Defendants" or "Uber Defendants" are used to refer to Uber Technologies, Inc. and Raiser-CA LLC collectively, while "Defendant-Driver" refers to Doe 1.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA, 18 USC 1595.

16. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Plaintiff resided in Kern County during the relevant period, suffered and continues to suffer the injuries caused by Defendants' conduct in Kern County. Moreover, the defendants resided in the Eastern District under §§ 1391(c)(2) and (d) because they deliberately operated a transportation network throughout the district, contracted with drivers there, solicited riders there, processed rides there, and had district-specific contacts sufficient to support personal jurisdiction if the district were treated as a separate state.

17. Plaintiff is filing this lawsuit within the 10 year statute of limitations following her 18th birthday.

## SEX TRAFFICKING OVERVIEW

18. Human trafficking is a widespread and heinous crime that has deeply scarred the moral fabric of society. Often referred to as modern-day slavery, it represents a severe public health crisis of epidemic proportions. This exploitation disrupts communities, drives criminal activity, and devastates countless families. Each year, millions of people are trafficked across the globe, including within and into the United States.
19. One of the most harmful and destructive forms of human trafficking is sex trafficking. This involves using force, fraud, or coercion to force an individual into engaging in commercial sex acts. Even if no force, fraud, or coercion is involved, the exploitation of a minor for commercial sex is human trafficking.
20. Sex trafficking represents a large part of global human trafficking and is the predominant form of transnational modern-day slavery. It is estimated that 4.8 million people are victims of sex trafficking worldwide, with the United States being the leading country in driving demand.
21. Women and girls are disproportionately impacted by this modern form of involuntary servitude, making up 99% of victims in the commercial sex industry. Within the realm of sex trafficking, children are undoubtedly the most vulnerable. According to research from the Polaris Project, the average age at which sex trafficking begins is during adolescence, though disturbingly, it can start as early as infancy.
22. In 2018, more than half (51.6%) of active criminal human trafficking cases in the United States involved sex trafficking of children only. According to the National Center for Missing and Exploited Children, reports of suspected child sex trafficking increased by 846 percent between 2010 and 2015. A survey found that in 2015, 55 percent of minors who became victims of sex trafficking met their traffickers through a website or mobile app. Increasingly, predators use the internet and social media to identify, target, and exploit vulnerable children.

23. The harms suffered by victims of sex trafficking are profound and extensive. Victims are routinely subjected to sexual violence, physical abuse, and repeated criminal exploitation, often by multiple offenders. They are frequently forced to endure extreme physical deprivation, including inadequate food, sleep, and medical care, and are exposed to serious health risks such as HIV/AIDS, hepatitis, and substance dependency. Psychological consequences are pervasive and severe, including depression, post-traumatic stress disorder, anxiety, and persistent fear. Survivors often experience cognitive and memory impairments, engage in self-destructive behaviors, and face social marginalization that intensifies the lasting impact of their victimization.

24. Traffickers employ illicit schemes, intricate networks of corporate entities, and rapidly evolving technologies to carry out their operations. More than a decade ago, human trafficking was identified as the third largest and fastest-growing criminal enterprise worldwide, driven by the combination of high profits and relatively low risk.

25. Human trafficking produces an estimated $150 billion in profits each year, approximately two-thirds of which stem from the sexual exploitation of trafficked individuals.

26. While traditional trafficking methods persist, online technologies now give traffickers an unprecedented ability to exploit larger numbers of victims and advertise across geographic boundaries. The rise of online exploitation has fundamentally transformed the commercial sex trade. Where buyers once had to leave their homes to engage in in-person transactions, the internet now enables remote access and anonymity. Online advertising has reshaped the commercial sex market and, in doing so, has contributed significantly to the growth of domestic sex trafficking.

27. The exploitation of sex trafficking victims is not confined to traffickers and sex buyers alone; rather, human trafficking enterprises rely on the participation of

ostensibly legitimate businesses to operate effectively. Traffickers understand that the viability of their operations often depends on access to and affiliation with mainstream commercial enterprises. When such businesses place profits above human welfare and become complicit, they facilitate continued exploitation and enable traffickers to adapt, innovate, and expand methods for profiting from the exploitation of human beings.

28. There is little question that sex trafficking operations cannot succeed without the assistance, support, or facilitation of other business organizations. Human trafficking is therefore accurately understood as a criminal enterprise that relies on mainstream commercial partners to flourish.

29. In recent years, traffickers have increasingly relied on a broad array of willing accomplices, including ostensibly legitimate businesses that knowingly profit from commercial relationships with trafficking ventures they know—or reasonably should know—are associated with the exploitation and misuse of human beings.

30. Private-sector involvement in human trafficking is pervasive. Traffickers utilize lodging establishments to house victims and carry out forced commercial sex acts, rely on financial institutions to process and launder proceeds, use ride-share companies to transport victims and deliver their sexual exploitation, and internet and social media platforms to recruit victims and market their services. Technological advancements in computing, software, and digital infrastructure further enable trafficking enterprises and enhance their profits.

31. Addressing the widespread growth of human trafficking requires accountability for those who knowingly profit from participation in ventures that a reasonable person knew or should have known were engaged in human enslavement. Civil litigation, therefore, serves as a critical tool in any comprehensive approach to combating sex trafficking in America.

## STATEMENT OF FACTS

**Plaintiff was Trafficked**

32. Starting at the age of 12, plaintiff was sex trafficked out of hotels. During the time period of 2014-2015, when plaintiff was 16 and 17 years old, plaintiff's trafficker started sending plaintiff on outcalls wherein she would take Uber rides to the location where the commercial sex would take place.
33. She was sometimes by herself and sometimes accompanied by a companion who was a year younger than her.
34. She was always dressed like a sex worker, with the intent to be provocative and sexually suggestive.
35. Objectively, the plaintiff looked younger than her 16 and 17 years of age. The Uber drivers often commented on how young she looked.
36. Plaintiff used her own Uber account, under names she fabricated. Defendants did not require any identification, age, or real name.
37. During these Uber rides, plaintiff and her companion would openly talk about their customers and that they were engaged in sex work. They talked explicitly in front of and with the Uber drivers. Plaintiff discussed her "regulars" and what services she provided and how much she got paid and shared stories with the drivers about her sex work.
38. Many drivers offered plaintiff various amounts for sex.
39. On one memorable occasion during this time period, plaintiff was getting an Uber ride to a regular customer in Long Beach and the Uber driver arranged with plaintiff to meet up after her sex appointment to have sex. They negotiated a price during that ride, exchanged numbers, and met up afterward at a restaurant then went to his apartment and had sex.
40. Plaintiff paid for her Uber rides with prepaid debit cards and cash app.

41. Although Uber's terms required users to represent that they were at least 18 and provide accurate information, Uber relied on unverified self-reporting and permitted a fictitious account funded by prepaid cards

42. As a direct and proximate result of being trafficked and subsequently abused in institutional placements, Plaintiff has suffered severe and ongoing physical, psychological, and emotional harm.

43. Plaintiff suffers from profound, chronic, and debilitating psychological injuries. These conditions include extreme anxiety, clinical depression, and severe trauma-related symptoms consistent with Post-Traumatic Stress Disorder (PTSD).

44. Plaintiff's psychological trauma routinely manifests in severe physical illnesses. These physical manifestations include uncontrollable shaking, rapid heart rate, sweating, severe gastrointestinal distress, and prolonged, vomiting requiring medical care.

45. Plaintiff has required ongoing mental health treatment, including therapy, psychiatric care, and multiple emergency room visits. She has incurred significant out-of-pocket medical expenses, including emergency treatment costs.

46. Plaintiff's trauma has significantly impacted her ability to work, maintain relationships, and function in daily life. She has experienced periods of disability, loss of employment opportunities, and difficulty performing basic tasks.

47. Plaintiff's relationships with her spouse, children, and extended family have been deeply affected. She experiences emotional instability, conflict, and isolation as a result of her trauma.

48. Plaintiff continues to suffer long-term and ongoing harm as a result of her trafficking, including lasting psychological trauma, impaired functioning, and diminished quality of life

**The Underlying Section 1591 Trafficking Venture**

49. During 2014 and 2015, Plaintiff was under eighteen years of age. Her trafficker knew Plaintiff's age and knew that she had not attained the age of eighteen.

50. Plaintiff's trafficker recruited, harbored, maintained, provided, transported, and caused Plaintiff to be transported for the purpose of engaging her in commercial sex acts. The trafficker arranged commercial-sex appointments with buyers, directed Plaintiff when and where to travel, determined or controlled the proceeds of the commercial sex acts, and caused Plaintiff to travel to buyers' residences, hotels, motels, and other locations where the commercial sex acts occurred.

51. Money and other things of value were given or received in exchange for the sex acts Plaintiff was caused to perform. Plaintiff was therefore caused to engage in "commercial sex acts" within the meaning of 18 U.S.C. § 1591(e)(3).

52. Because Plaintiff was a minor, proof of force, fraud, or coercion is not required to establish the underlying violation of 18 U.S.C. § 1591.

53. The trafficking venture operated in and affected interstate commerce, including through the use of Defendants' interstate communications network, electronic payment systems, mobile applications, cellular communications, internet-based dispatch services, and instrumentalities of interstate commerce.

54. The relevant venture was the ongoing commercial undertaking through which Plaintiff's trafficker arranged buyers, directed Plaintiff to commercial-sex appointments, caused her to be transported to and from those appointments, collected or controlled proceeds, and repeatedly exploited Plaintiff for profit.

55. Transportation was a recurring and necessary operational component of that venture. The venture required a dependable means of delivering Plaintiff to buyers and returning her after the commercial sex acts occurred.

56. Defendants participated in that venture by repeatedly accepting, dispatching, processing, and completing rides that transported Plaintiff directly to and from the venture's commercial-sex transactions.

57. Defendants's participation was not limited to an isolated or incidental transaction. Defendants repeatedly supplied the same essential transportation function over an extended period, collected a fee from each completed trafficking-related ride, maintained the accounts and electronic infrastructure through which the transportation was obtained, and continued providing the service despite direct indicators known to its drivers that Plaintiff was a minor being transported for commercial sex.

**Violations of Defendant's Policies**

58. At all relevant times, Defendant maintained policies prohibiting the transportation of unaccompanied minors.

59. Defendant required drivers to confirm rider identity and decline noncompliant rides

60. In Plaintiff's case, this policy was violated.

61. Drivers knew or should have known that: Plaintiff was a minor traveling alone; did not check any ID or confirm that she was a legitimate account holder.

62. Despite these violations, drivers completed rides and transported Plaintiff to and from commercial sex liaisons with full knowledge of the reasons for the trips.

**Driver Incentives and Algorithmic Pressure**

63. Defendant structured its platform to incentivize drivers to accept and complete rides, even when policy violations were apparent.

64. Drivers who cancelled rides risked:

- losing compensation for the trip;
- negative impacts on performance metrics;
- reduced access to future ride assignments;
- deprioritization by dispatch algorithms

65. Defendant tracked cancellation rates and used them in allocating future ride opportunities.

66. These systems created economic and operational pressure on drivers to proceed with rides rather than cancel them, even where policy violations existed.

67. As a result, Defendant effectively encouraged drivers to disregard policy violations, including those involving minors and mismatched account holders.

**2014-2016 Platform Design and Policy Context**

68. During the relevant time period, Defendant emphasized rapid ride acceptance and completion as key performance metrics.

69. Drivers were evaluated based on acceptance rates, cancellation rates, and responsiveness.

70. Drivers with higher cancellation rates faced reduced ride opportunities and lower priority within the platform.

71. Defendant's platform did not require meaningful identity verification of riders at pickup.

72. Defendant did not implement effective safeguards to prevent ride arrangements involving unaccompanied minors.

**Observable Indicators During Rides**

73. During rides, drivers either expressly knew or should have known that they were transporting a young girl to commercial sex activities.

74. Plaintiff was obviously a minor, was dressed scantily with any eye toward sexualized presentation, often traveled alone at late hours, and was transported to short-term lodging locations for the express purpose of commercial sex.

75. Drivers knew that unlawful and inappropriate conduct was taking place.

76. Despite this knowledge, drivers continued transporting Plaintiff without escalation or reporting.

**Defendant's Knowledge**

77. Defendant collected detailed ride data, including identity, location, timing, and ride patterns.
78. Defendant knew or should have known that a minor was being transported repeatedly; rides followed recurring high-risk patterns.
79. Defendant failed to act on this information.
80. Defendant continued to profit from these rides.

**Internal Policies, Metrics, and Corporate Awareness**

81. On information and belief, during the relevant time period, Defendant maintained internal policies, training materials, and operational guidance addressing rider safety, account integrity, and driver performance metrics.
82. On information and belief, Defendant tracked and internally analyzed driver performance using metrics including acceptance rates, cancellation rates, ride completion rates, and responsiveness.
83. On information and belief, Defendant used these metrics to evaluate drivers and to allocate ride opportunities through its dispatch system.
84. On information and belief, drivers who cancelled rides—regardless of reason—were subject to negative impacts on these metrics, which in turn affected their ability to receive future ride assignments.
85. On information and belief, Defendant was aware that this performance-based system discouraged drivers from cancelling rides, including in circumstances involving policy violations or rider safety concerns.
86. On information and belief, Defendant maintained internal guidance instructing drivers to avoid cancelling rides except in limited circumstances, and to prioritize ride completion.
87. On information and belief, Defendant did not provide drivers with clear, enforceable mechanisms to verify rider age at pickup.

88. On information and belief, Defendant was aware that its platform permitted use of accounts by minors and did not consistently enforce restrictions against such use.

89. On information and belief, Defendant maintained internal data reflecting: frequent transportation to and from short-term lodging locations; recurring late-night ride patterns; and clusters of rides consistent with commercial activity.

90. On information and belief, Defendant analyzed or had the capability to analyze such data and identify anomalous or high-risk patterns.

91. On information and belief, Defendant was aware that its platform was being used in connection with unlawful exploitation, including involving minors, prior to and during the time Plaintiff was transported.

92. On information and belief, Defendant received external information—including public reports, complaints, or internal escalations—regarding misuse of its platform for unlawful or exploitative purposes.

93. On information and belief, despite this awareness, Defendant did not implement effective safeguards sufficient to detect, prevent, or disrupt such activity.

94. On information and belief, Defendant's officers, directors, and managing agents were aware of these risks and the limitations of existing safeguards.

95. On information and belief, Defendant made deliberate decisions regarding platform design, driver incentives, and enforcement priorities that favored ride volume and growth over stricter safety enforcement.

**Conscious Disregard Supporting Punitive Damages**

96. Defendant had advance knowledge of the risks that its platform could be used to facilitate unlawful exploitation, including involving vulnerable and underage individuals.

97. Despite this knowledge, Defendant failed to implement reasonable and available safeguards, including: meaningful identity and age verification mechanisms;

enforcement of restrictions on unaccompanied minors; and intervention protocols for high-risk ride patterns.

98. Defendant maintained and enforced performance metrics and incentive structures that discouraged drivers from cancelling rides, even where policy violations or safety concerns were apparent.

99. Defendant knew that these systems would predictably result in drivers completing rides under unsafe or noncompliant conditions.

100. Defendant's failure to modify these systems, despite known risks, constituted a conscious disregard for the safety of riders, including Plaintiff.

101. Defendant's conduct was not inadvertent but resulted from corporate-level decisions regarding platform design, incentives, and enforcement priorities.

102. On information and belief, Defendant's officers, directors, and managing agents authorized, ratified, or were deliberately indifferent to the conduct described herein.

103. Defendant's actions were carried out with willful and conscious disregard of the rights and safety of others.

**Industry Knowledge, Public Reports, And Prior Incidents**

104. On information and belief, prior to and during the relevant time period, the risk that transportation services—including rideshare platforms—could be used in connection with unlawful exploitation was widely recognized.

105. Publicly available materials from governmental bodies and nonprofit organizations described transportation as a recurring component of trafficking operations and identified transportation providers as businesses that regularly intersect with traffickers, victims, and survivors.

106. By way of example, the U.S. Senate Permanent Subcommittee on Investigations issued its January 2017 report, "Backpage.com's Knowing Facilitation of Online Sex Trafficking," following a bipartisan investigation into

how traffickers used online systems to facilitate trafficking. That report described the commercial ecosystem surrounding trafficking activity and noted that Backpage was implicated in a substantial share of suspected child-trafficking reports received by NCMEC.

107. On information and belief, that report reinforced what was already publicly apparent during the relevant period: trafficking operations often depended on interconnected commercial services, including advertising, lodging, communications, payment systems, and transportation. This allegation does not assert that the Senate report specifically analyzed Defendant's platform, but rather that the report reflects the broader public understanding that legitimate service providers can become part of the infrastructure through which trafficking is carried out.

108. Publicly available materials from Polaris likewise identified transportation as an essential system used to move individuals to and between trafficking locations and emphasized that private-sector transportation providers can help prevent, detect, and disrupt trafficking through targeted policies and training.

109. Polaris's transportation-sector guidance identified reasonable anti-trafficking measures for transportation providers, including policies prohibiting the use of company services to facilitate trafficking, training personnel on indicators and reporting, and implementing procedures tailored to the transportation context.

110. On information and belief, these and similar materials described indicators relevant to transportation providers, including transportation for minors, frequent travel to short-term lodging locations, and patterns involving multiple trips within short periods.

111. On information and belief, such materials were publicly available and accessible to companies operating transportation platforms, including Defendant, during or by the close of the relevant period.

112. On information and belief, Defendant was aware of, or at a minimum had access to, public guidance and reporting of this kind through its operations, safety functions, industry engagement, and public-facing activities.

113. On information and belief, the existence of these materials made it foreseeable that a transportation platform lacking effective safeguards for unaccompanied minors, repeated motel drop-offs, and suspicious ride patterns could be used in connection with unlawful exploitation.

**Prior Incidents Involving Defendant's Platform**

114. On information and belief, prior to and during the time Plaintiff was transported, Defendant's platform had been used in other instances involving unlawful or exploitative conduct.

115. On information and belief, Defendant received complaints, reports, or internal escalations relating to rides involving vulnerable individuals or suspicious circumstances.

116. On information and belief, such reports included situations involving: riders who appeared underage; transportation arranged by individuals other than the rider; repeated trips to short-term lodging locations; and riders exhibiting signs of distress.

117. On information and belief, Defendant maintained internal systems capable of tracking such reports and identifying patterns across rides, drivers, and accounts.

118. On information and belief, Defendant had the ability to correlate such reports with ride data, including locations, timing, and account usage patterns

119. On information and belief, despite this information, Defendant did not implement effective measures sufficient to detect or prevent repeated high-risk transportation patterns.

**Industry Standards and Reasonable Safeguards**

120. On information and belief, public guidance from organizations such as Polaris Project and similar entities identified reasonable measures for transportation providers, including: enforcing restrictions on unaccompanied minors; verifying that riders correspond to account holders; monitoring for repeated high-risk ride patterns; implementing reporting and escalation protocols; and providing training to identify vulnerable riders.

121. On information and belief, such measures were feasible and consistent with standard safety practices for companies engaged in transporting individuals.

122. On information and belief, Defendant either failed to implement these measures or implemented them in a manner that was ineffective due to competing incentives and design choices.

**Foreseeability and Corporate Awareness**

123. On information and belief, the combination of: publicly available reports and industry guidance; prior incidents on Defendant's platform; internal data and reporting systems; and observable ride patterns made the risk of harm to individuals such as Plaintiff foreseeable to Defendant.

124. On information and belief, Defendant's officers, directors, and managing agents were aware of these risks and the limitations of existing safeguards.

125. On information and belief, Defendant nevertheless continued to operate its platform without implementing sufficient protections.

126. On information and belief, Defendant's failure to act in the face of known risks reflects a conscious disregard for the safety of vulnerable individuals.

**Raiser-CA**

127. During the relevant period, Rasier-CA was not a passive holding company. Rasier-CA operated, conducted, authorized, or was legally responsible for Uber-

branded transportation-network services in California. Rasier-CA obtained or exercised the regulatory authority under which those services were provided, represented the Uber transportation operation before California regulators, and was responsible for compliance with requirements directed to California transportation-network companies.

128. Rasier-CA participated directly in the rides at issue by authorizing Uber-affiliated drivers to provide transportation in California, making those drivers available through the Uber platform, establishing or enforcing conditions governing their access to ride requests, and receiving, directly or indirectly, financial value from completed California rides.

129. On information and belief, the drivers who transported Plaintiff were authorized to provide Uber-branded transportation in California through contracts, accounts, credentials, approvals, or operational arrangements maintained by Rasier-CA, either directly or through another Uber-affiliated entity acting on its behalf.

130. Rasier-CA knew or should have known that its California transportation service was being used to transport an obviously underage girl to and from commercial sex transactions because its authorized drivers acquired direct knowledge of Plaintiff's age and exploitation while carrying out the very transportation services Rasier-CA authorized them to perform.

## FIRST CAUSE OF ACTION: TVPRA

Trafficking Victims Protection Reauthorization Act ("TVPRA")

18 U.S.C. § 1595 (against all defendants).

131. The civil remedy provision of the federal human trafficking statute is found at 18 U.S.C. § 1595, and it reads:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in

> an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney's fees.

132. Thus, the federal sex trafficking statute consists of four elements: (a) the defendant(s) knowingly benefited from participation in a venture, (b) from participation in a venture, (c) the venture violated the TVPRA, and (d) the defendant(s) knew or should have known the venture violated the sex trafficking statute.

133. Plaintiff incorporates all preceding paragraphs.

134. At all relevant times, each driver who transported Plaintiff acted as the employee, actual agent, ostensible agent, servant, representative, or authorized transportation provider of one or more of the Defendants. The drivers acted within the course and scope of that relationship when they accepted ride requests, traveled to Plaintiff's pickup location, transported Plaintiff, communicated with her during the ride, completed the ride, and generated compensation for themselves and the Defendants.

135. The knowledge acquired by the drivers concerning Plaintiff's youth and commercial sexual exploitation was acquired while the drivers performed the transportation function entrusted to them by the Defendants. That knowledge concerned the safety of the passenger, the legality and purpose of the transportation, compliance with Defendants' rider policies, and whether the ride should be completed or reported. The drivers' knowledge is therefore attributable to the Defendants that contracted with, authorized, dispatched, controlled, or financially benefited from the drivers' performance.

136. The Defendants held the drivers out to Plaintiff and the public as authorized providers of Uber transportation. The drivers used the Uber name, app, dispatch system, payment system, pricing structure, rating system, and other instrumentalities supplied by the Defendants. Plaintiff reasonably understood that the drivers were providing transportation on behalf of Uber and did not know of any undisclosed allocation of corporate responsibility among the Defendants.

137. To the extent one Defendant acted in connection with Plaintiff's rides through another Defendant, the acting entity did so as the actual or ostensible agent, representative, service provider, or joint participant of the other. Each Defendant authorized, directed, participated in, or knowingly accepted the benefits of the conduct undertaken through the integrated Uber transportation operation.

138. Defendant knowingly benefited from participation in a venture that it knew or should have known engaged in violations of 18 U.S.C. § 1591.

139. Defendant participated by: dispatching rides for a minor; allowing repeated policy violations; and structuring incentives that encouraged completion of such rides.

140. Defendants' transportation services were integral to the trafficking venture and constituted substantial assistance without which the venture could not have operated as carried out.

141. These actions were not passive or incidental but constituted active and continuous participation in a venture that depended on Defendant's transportation services to function.

142. Defendant knew or, at a minimum, should have known and consciously avoided learning that its platform was being used in connection with unlawful exploitation through: driver awareness of policy violations; repeated rider/account mismatches; platform data reflecting patterns.

143. Defendant's knowledge is further evidenced by its internal data systems, performance metrics, and awareness of repeated policy violations, as described above, which collectively demonstrate that Defendant knew or should have known that its platform was being used in connection with unlawful activity involving Plaintiff.

144. Defendant's knowledge is further supported by publicly available industry guidance and reports identifying transportation services as a component of unlawful exploitation, which made the risk to Plaintiff foreseeable.

145. As a common carrier owing the highest duty of care to its passengers, Defendant had an obligation to exercise utmost care and diligence for Plaintiff's safety, including identifying and responding to indicators of sex trafficking occurring through its platform. Despite this heightened duty, Defendant knew or, at a minimum, should have known that its services were being used to facilitate unlawful exploitation, yet continued to provide transportation and derive financial benefit from such activity.

146. Defendant knowingly benefited financially from participation in the venture by collecting fees, commissions, and other revenue from each ride arranged and completed through its platform, including rides that facilitated Plaintiff's exploitation.

147. Defendant's financial benefit was directly tied to the volume and completion of rides, including those that facilitated Plaintiff's exploitation.

148. Plaintiff suffered harm as a direct result.

149. Defendant had the ability to identify, disrupt, and prevent the ongoing use of its platform in connection with Plaintiff's exploitation, yet failed to take reasonable steps to do so. This failure enabled the continuation of the trafficking venture and directly contributed to Plaintiff's harm.

150. Defendant's conduct was part of a continuous course of action involving repeated transactions and ongoing facilitation, rather than isolated or incidental involvement.

151. While transporting Plaintiff, the drivers acted as Defendants' agents and within the scope of their agency. The relevant knowledge was acquired while they performed Defendants' core transportation function and encountered the precise hazard arising from that function. Defendants' operational control during the relevant time frame was tremendous:

a. They selected and onboarded drivers;
b. They controlled access to the platform;

c. They set or controlled fares;

d. They matched riders and drivers;

e. They dictated the route or provided navigation;

f. They processed payment;

g. They retained a percentage of the fare;

h. They monitored acceptance and cancellation rates;

i. They could suspend or deactivate drivers;

j. They prescribed rider-interaction and cancellation policies;

k. They received ratings and complaints;

l. They retained ride records;

m. drivers represented themselves as Uber drivers;

n. Plaintiff relied on the Uber brand and app.

152. Defendants:

a. facilitated additional commercial sex acts that otherwise could not have occurred in the same manner, frequency, locations, or timeframe;

b. increased the number and geographical range of buyers;

c. enabled repeated "outcalls" that depended on transportation;

d. prolonged or intensified Plaintiff's exploitation;

e. exposed her to additional rapes, assaults, buyers, and trauma;

f. deprived her of intervention opportunities when drivers directly recognized the trafficking;

g. was a substantial factor in discrete trafficking episodes and indivisible aggravation of her injuries.

153. Each Uber Defendant knowingly received a financial or other benefit from its own participation in the transportation transactions at issue. Uber Technologies received platform fees, service fees, data, increased transaction volume, and other value from completed rides. Rasier-CA received fees, revenue, regulatory and

commercial benefits, or other value from the operation and completion of Uber-branded rides in California.

154. The Defendants' financial benefits were tied to participation in completed transactions. Plaintiff does not rely solely on an attenuated benefit from the general success of the Uber enterprise. The challenged benefits arose from rides that transported Plaintiff directly to or from commercial sex transactions and were earned or received because those rides were accepted, dispatched, processed, and completed.

155. Uber Technologies participated in the venture by supplying and operating the technological, dispatch, account, payment, data, and incentive systems through which the transportation was arranged and completed.

156. Rasier-CA participated in the venture by operating or authorizing Uber-branded transportation in California, supplying or authorizing the drivers who transported Plaintiff, imposing or enforcing the operative driver and safety policies, and permitting the repeated completion of transportation directly connected to Plaintiff's commercial sexual exploitation.

157. Each Defendant knew or should have known that the venture engaged in acts violating 18 U.S.C. § 1591. That knowledge arose from the direct knowledge acquired by Defendants' drivers and agents during Plaintiff's rides, Plaintiff's repeated transportation patterns, the entities' shared operational and account data, internal reports and safety systems, and the entity-specific responsibilities alleged herein.

## SECOND CAUSE OF ACTION: CAVRA

Child Abuse Victim's Rights Act ("CAVRA")

18 U.S.C. § 2255 (against all defendants).

158. Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

159. The Child Abuse Victims' Rights Act, 18 U.S.C. § 2255, provides a civil remedy to any person who, while a minor, was a victim of a violation of certain enumerated federal criminal statutes, including 18 U.S.C. § 1591, and who suffers personal injury as a result of that violation.

160. At all relevant times, Plaintiff was under eighteen years of age and was therefore a minor within the meaning of 18 U.S.C. §§ 1591 and 2255.

161. During 2014 and 2015, when Plaintiff was sixteen and seventeen years old, Plaintiff's trafficker recruited, harbored, maintained, provided, transported, obtained, and caused Plaintiff to be transported for the purpose of engaging her in commercial sex acts.

162. Plaintiff's trafficker knew that Plaintiff had not attained the age of eighteen and caused Plaintiff to engage in sex acts for which money or other things of value were given to or received by Plaintiff, her trafficker, or other participants in the trafficking venture.

163. Because Plaintiff was under eighteen years of age, the conduct described herein constituted sex trafficking in violation of 18 U.S.C. § 1591 regardless of whether force, fraud, or coercion was used to cause Plaintiff to engage in the commercial sex acts.

164. The trafficking venture operated in and affected interstate commerce. Among other things, the venture used cellular telephones, internet communications, electronic payment systems, prepaid debit cards, mobile applications, and Uber's interstate communications, dispatch, payment, and transportation network to arrange and facilitate Plaintiff's transportation to and from commercial sex transactions.

165. Transportation was a necessary and recurring component of the trafficking venture. Plaintiff's trafficker caused Plaintiff to travel to buyers' residences, hotels, motels, and other locations where commercial sex acts were performed and

required transportation to deliver Plaintiff to those locations and retrieve or return her after the commercial sex acts occurred.

166. Defendants supplied, authorized, dispatched, operated, processed, and financially benefited from the transportation through which Plaintiff was repeatedly delivered to and from commercial sex transactions.

167. During the challenged rides, Plaintiff appeared plainly and unusually young. Defendant Drivers observed her physical appearance, heard her discuss her customers, the sexual services she performed, the prices charged for those services, and the commercial-sex appointments to which she was traveling.

168. Defendant Drivers commented on Plaintiff's apparent youth and thereby demonstrated their awareness that Plaintiff appeared to be a minor.

169. Plaintiff and her similarly underage companion openly discussed, in the presence of and directly with Defendant Drivers, their commercial sex activities, their customers, the services they performed, the prices charged, and the commercial-sex transactions to which they were traveling.

170. These communications gave Defendant Drivers direct and contemporaneous knowledge that Plaintiff was a minor, or at minimum caused them consciously and recklessly to disregard the substantial probability that she was a minor, and that she was being transported for the purpose of engaging in commercial sex acts.

171. Despite that knowledge, Defendant Drivers knowingly transported Plaintiff to and from the commercial sex transactions, completed the rides, and generated compensation and other financial benefits for themselves and the Uber Defendants.

172. Multiple Defendant Drivers solicited Plaintiff for commercial sex after learning through their interactions with Plaintiff that she was a young and exploited commercial-sex worker.

173. On at least one occasion, a Defendant Driver used an Uber ride to solicit and arrange a commercial sex transaction with Plaintiff. During the ride, while acting as an authorized Uber driver and providing Uber transportation, the driver

negotiated a price with Plaintiff, exchanged contact information with her, and arranged to meet her after the commercial-sex appointment to which he was then transporting her.

174. After completing the Uber ride, the Defendant Driver met Plaintiff, took her to his apartment, gave or agreed to give money or another thing of value in exchange for a sex act, and commercially sexually exploited Plaintiff while she was under eighteen years of age.

175. The Defendant Driver knew, or recklessly disregarded the fact, that Plaintiff had not attained the age of eighteen and would be caused to engage in a commercial sex act.

176. By knowingly soliciting, patronizing, obtaining, and causing a minor to engage in a commercial sex act, and by benefiting from participation in the venture while knowing or recklessly disregarding that Plaintiff was a minor who would be caused to engage in commercial sex, the Defendant Driver directly violated 18 U.S.C. § 1591(a).

177. At all relevant times, Defendant Drivers acted as the employees, actual agents, ostensible agents, servants, representatives, or authorized transportation providers of one or more of the Uber Defendants.

178. Defendant Drivers acquired their knowledge of Plaintiff's age and commercial sexual exploitation while performing the transportation duties entrusted to them by the Uber Defendants and while acting within the course and scope of their agency or other authorized relationship.

179. The knowledge acquired by Defendant Drivers concerned the identity and safety of an Uber passenger, compliance with Defendants' restrictions concerning minors, the legality and purpose of the transportation, and whether the rides should be completed, cancelled, escalated, or reported. That knowledge is attributable to the Uber Defendant or Defendants that contracted with, authorized, dispatched, controlled, or financially benefited from the drivers' performance.

180. The Uber Defendants knowingly benefited, financially and by receiving things of value, from their participation in the trafficking venture and the challenged transportation transactions.

181. The Uber Defendants received fares, service fees, commissions, platform fees, transaction revenue, data, increased ride volume, and other financial and commercial benefits each time a trafficking-related ride was accepted, dispatched, processed, and completed.

182. The Uber Defendants' benefits were not derived merely from their general operation of an unrelated transportation business. The benefits alleged herein were generated by the specific rides through which Plaintiff was transported directly to or from commercial sex transactions.

183. Completion of the challenged rides was the event that generated compensation for Defendant Drivers and transaction-based revenue or other value for the Uber Defendants. Had the rides been declined or cancelled because Plaintiff was a minor being transported for commercial sex, Defendants would not have received those transaction-specific financial benefits.

184. The Uber Defendants participated in the venture by repeatedly providing its necessary transportation component; authorizing and dispatching the drivers who transported Plaintiff; processing and completing the rides; collecting and allocating the resulting payments; maintaining the accounts and infrastructure through which the rides were obtained; and continuing to make transportation available despite direct and observable evidence that Plaintiff was a minor being transported for commercial sex.

185. The Uber Defendants knew or recklessly disregarded the fact that Plaintiff had not attained the age of eighteen and would be caused to engage in commercial sex acts.

186. The Uber Defendants' knowledge or reckless disregard is supported by, among other things:

a. the direct and contemporaneous knowledge acquired by Defendant Drivers while performing Defendants' transportation services;

b. the drivers' comments concerning Plaintiff's apparent youth;

c. Plaintiff's explicit discussions with Defendant Drivers about her customers, sexual services, prices, and commercial-sex appointments;

d. the repeated transportation of Plaintiff to and from locations where commercial sex acts occurred;

e. the solicitation of Plaintiff for commercial sex by multiple Defendant Drivers;

f. one Defendant Driver's use of an Uber ride to negotiate and arrange his own commercial sex transaction with Plaintiff;

g. the repeated completion of rides notwithstanding violations of Defendants' policies concerning minors, account integrity, passenger safety, and unlawful use of the platform;

h. Defendants' possession of account, ride, location, timing, destination, payment, driver, complaint, and transaction data concerning the challenged rides; and

i. Defendants' deliberate continuation of a compensation and ride-completion system that generated revenue when suspicious rides were completed and discouraged drivers from cancelling or interrupting those rides.

187. In consciously disregarding these facts and continuing to authorize, dispatch, process, and profit from the trafficking-related rides, the Uber Defendants knowingly benefited from participation in a venture while knowing or recklessly disregarding that Plaintiff was under eighteen and would be caused to engage in commercial sex acts, in violation of 18 U.S.C. § 1591(a)(2).

188. The Uber Defendants are also responsible for the violations committed by Defendant Drivers under principles of actual agency, ostensible agency, respondeat superior, ratification, authorization, and joint participation.

189. The Defendant Driver's solicitation and commercial sexual exploitation of Plaintiff arose directly from and was accomplished through the transportation relationship created by Defendants. The driver encountered Plaintiff through Uber's platform, acquired access to her while performing an Uber ride, learned of her exploitation during the ride, used the ride to negotiate the commercial sex transaction, and exploited the access and apparent authority Defendants gave him as an Uber driver.

190. On information and belief, the Uber Defendants authorized or ratified the relevant conduct by retaining the financial benefits generated by the rides; failing to establish or enforce effective safeguards against the transportation and exploitation of unaccompanied minors; failing to investigate, report, or prevent driver misconduct; and continuing to authorize drivers and accounts associated with suspicious or unlawful activity.

191. Alternatively, to the extent the Court determines that an independent criminal violation by each Uber Defendant is not required, the Uber Defendants are subject to liability under 18 U.S.C. § 2255 because Plaintiff was a minor victim of a violation of § 1591, suffered personal injury as a result, and the Uber Defendants' knowing participation in and financial benefit from the trafficking venture caused, facilitated, prolonged, and intensified that injury.

192. Defendants' conduct enabled Plaintiff's trafficker to transport Plaintiff efficiently and repeatedly to additional buyers, increased the number and geographic range of commercial sex transactions to which Plaintiff was subjected, prolonged and intensified her exploitation, and exposed her to additional sexual assaults and commercial sexual abuse.

193. Defendants' conduct also deprived Plaintiff of repeated opportunities for rescue or intervention. Defendant Drivers directly recognized or were made aware that an apparently underage girl was being transported for commercial sex, but instead of reporting or interrupting the exploitation, they completed the rides, generated revenue from them, and in some instances sought to exploit Plaintiff themselves.

194. As a direct and proximate result of the violations alleged herein, Plaintiff suffered personal injuries within the meaning of 18 U.S.C. § 2255, including repeated sexual exploitation and abuse, physical injuries, severe emotional distress, psychological trauma, post-traumatic stress symptoms, anxiety, depression, medical and mental-health expenses, impairment of her ability to work and maintain relationships, loss of enjoyment of life, and other past and continuing injuries.

195. Plaintiff's injuries were a foreseeable and direct consequence of using Defendants' transportation system to deliver a minor to commercial sex transactions and of Defendants' failure to interrupt that transportation after their agents acquired direct knowledge of Plaintiff's age and exploitation.

196. Under 18 U.S.C. § 2255, Plaintiff is entitled to recover the actual damages she sustained or, in the alternative, liquidated damages in the amount of $150,000, together with the costs of this action, reasonable attorney's fees, and other litigation costs reasonably incurred.

197. Because Defendants acted intentionally, maliciously, oppressively, fraudulently, and with willful and conscious disregard for Plaintiff's rights and safety, Plaintiff also seeks punitive damages under 18 U.S.C. § 2255 and all other preliminary, equitable, and ancillary relief the Court determines appropriate.

## PUNITIVE DAMAGES

198. Plaintiff incorporates all preceding paragraphs.

199. Defendant acted with malice, oppression, and fraud within the meaning of California Civil Code § 3294.

200. Defendant's conduct was despicable and carried out with a willful and conscious disregard of the rights and safety of others.

201. Defendant's conduct was intentional, knowing, and carried out in conscious disregard of a high probability of harm to Plaintiff.

202. Defendant's officers, directors, and managing agents authorized, ratified, or were aware of the conduct described herein.

203. On information and belief, Defendant's conscious failure to adopt and enforce reasonable safeguards, despite known risks and publicly available guidance identifying transportation providers as recurring points of intersection with trafficking activity, further demonstrates Defendant's willful and knowing disregard for Plaintiff's safety.

204. Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

Plaintiff prays for judgment to be entered for Plaintiff against Defendants, jointly and severally, for actual, general, special, compensatory, and punitive damages as the evidence may show and the jury may determine to be proper, together with restitution and disgorgement of all ill-gotten gains, costs of suit, prejudgment interest, post-judgment interest, attorneys' fees pursuant to 18 U.S.C. § 1595, and such other and further relief to which Plaintiff may show herself to be justly entitled, at law or in equity.

**JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury on all the issues so triable.

POTTER HANDY, LLP

Dated: July 22, 2026 By: /s/ Mark Potter .
Mark Potter
Attorneys for Plaintiff